OPINION
{¶ 1} Plaintiff-Appellant The Bryan Publishing Company ("Bryan Publishing") appeals the October 17, 2007 Decision and Judgment Entry of the Court of Common Pleas, Henry County, Ohio denying Bryan Publishing's partial motion for summary judgment and granting summary judgment in favor of the Defendant-Appellees, the former shareholders in Napoleon, Inc. ("Shareholders"), a corporation that owned and operated the Northwest Signal.
 {¶ 2} This matter arises out of the sale of Napoleon, Inc. which operated the Northwest Signal, a local newspaper serving Napoleon, Ohio.[1] The decision to sell the Northwest Signal was made in 2003 by the Shareholders, who were predominantly members of the Kuser family. The decision to sell the paper came after family discussion concerning the family's waning desire to run the paper.
 {¶ 3} To market the paper, the Shareholders employed the assistance of Dirks, Van Essen Murray ("the Broker"), a brokerage firm specializing in the sale of newspapers. The Broker then prepared a Prospectus with the help of the Shareholders, which provided information about the Northwest Signal to potential purchasers. The Prospectus was essentially an informative advertisement of the paper for sale. *Page 3 
 {¶ 4} In determining where to send the Prospectus, the Kuser family was concerned that the paper be sold to new owners who would continue to publish the paper and would not just absorb the paper into another publication. The Kuser family decided to approach Bryan Publishing, as prior to the decision to sell the Northwest Signal, the Kuser family had a working relationship with Bryan Publishing, who printed the Northwest Signal for approximately ten years.
 {¶ 5} To accomplish the sale of the Northwest Signal, both Bryan Publishing and the Shareholders entered into an Agreement for Purchase and Sale of Shares, dated November 3, 2003. The agreement was prepared by Bryan Publishing's legal counsel. The Agreement for Purchase contained an eleven day period prior to closing for the Kuser family to give Bryan Publishing additional Northwest Signal records, as well as for Bryan Publishing to request any additional information. An escrow agreement was entered into on November 13, 2003.
 {¶ 6} Subsequent to entering into the Agreement for Purchase and Sale of Shares, after the transaction had been completed and Bryan Publishing was actively operating the Northwest Signal, Bryan Publishing discovered a discrepancy between some of the actual operating numbers for the Northwest Signal and those contained in the Prospectus. Specifically, Bryan Publishing claims that the Shareholders misrepresented the daily amount of paid circulation *Page 4 
of the Northwest Signal. Bryan Publishing also argues that the Shareholders failed to disclose pre-paid subscriptions as a liability. With respect to the pre-paid subscriptions, the issue was not that an incorrect representation occurred, but that there was no representation of pre-paid subscriptions in the information turned over to Bryan Publishing prior to its takeover of the Northwest Signal.
 {¶ 7} Based on these discrepancies, Bryan Publishing filed a complaint on December 20, 2005. In its complaint, Bryan Publishing claimed Fraudulent Misrepresentation and Omissions and Nondisclosure, Fraud in the Inducement, Breach of Contract, Negligent Misrepresentations, Bad Faith, Breach of Implied Warranty of Good Faith and Fair Dealing, and Punitive Damages. From January 31, 2006 to June 14, 2006 all of the Shareholders filed answers.
 {¶ 8} On April 27, 2007 Bryan Publishing filed for partial summary judgment. The Shareholders also filed a motion for summary judgment on May 30, 2007. Various response memoranda were subsequently filed. On October 17, 2007 the trial court granted the Shareholders' motion for summary judgment. The trial court addressed each of Bryan Publishing's claims separately and then summarily found as follows:
 As to all of Plaintiff's claims, paragraph 8(a) of the Purchase Agreement provided Plaintiff the opportunity to exercise and complete its "due diligence" with respect to the books, records and other matters relating to the business of the Corporation *Page 5 and determine that there were no previously undisclosed matters, which in the sole judgment of the purchaser would materially affect the value of the stock of the Corporation, prior to closing. Therefore in the absence of any mention, much less representation or warranty in the Purchase Agreement concerning paid circulation or reporting of a liability for prepaid subscriptions, if these matters were so important as to materially affect the value of the Corporation stock, Plaintiff was obliged to inquire further prior to closing and did not do so.
 {¶ 9} Bryan Publishing now appeals asserting three assignments of error. ASSIGNMENT OF ERROR I THE TRIAL COURT IMPROPERLY GRANTED DEFENDANTS' (SHAREHOLDERS-APPELLEES') MOTION FOR SUMMARY JUDGMENT SINCE THE DECISION WAS INCONSISTENT WITH THE LAW OF SUMMARY JUDGMENT AND THE FACTS AT ISSUE IN THE CASE, AS THERE WERE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE.
 ASSIGNMENT OF ERROR II THE TRIAL COURT ERRED WHEN IT HELD THAT GENERALLY ACCEPTED ACCOUNTING PRINCIPLES DID NOT REQUIRE THE SHAREHOLDERS-APPELLEES TO DISCLOSE "PRE-PAID SUBSCRIPTIONS" ON ITS BALANCE SHEET OR FINANCIAL STATEMENTS WHICH FAILURE TO DISCLOSE CONSTITUTED A MATERIAL MISREPRESENTATION OF FACT.
 ASSIGNMENT OF ERROR III THE SHAREHOLDERS-APPELLEES' MISREPRESENTATIONS WERE NEGLIGENTLY MADE AND SUMMARY JUDGMENT IN FAVOR OF SHAREHOLDERS-APPELLEES WAS INAPPROPRIATE.
 {¶ 10} For ease of discussion, we elect to consolidate Bryan Publishing's assignments of error. In all of its assignments of error Bryan Publishing argues *Page 6 
that the trial court erred in granting summary judgment in favor of the shareholders.
 {¶ 11} An appellate court reviews a grant of summary judgment independently, and without any deference to the trial court.Conley-Slowinski v. Superior Spinning Stamping Co. (1998),128 Ohio App.3d 360, 363, 714 N.E.2d 991. The standard of review for a grant of summary judgment is de novo. Hasenfratz v. Warnement 3rd Dist. No. 1-06-03, 2006-Ohio-2797 citing Lorain Nat'l. Bank v. Saratoga Apts.
(1989), 61 Ohio App.3d 127, 572 N.E.2d 198.
 {¶ 12} A grant of summary judgment will be affirmed only when the requirements of Civ. R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ. R. 56(C); see Horton v. Harwich Chem. Corp. (1995), 73 Ohio St.3d 679,653 N.E.2d 1196, 1995-Ohio-286, paragraph three of the syllabus. Additionally, Civ. R. 56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as *Page 7 
to any material fact and that the moving party is entitled to judgment as a matter of law.
 {¶ 13} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 116, 526 N.E.2d 798. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. Dresher v. Burt (1996),75 Ohio St.3d 280, 292, 662 N.E.2d 264, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ. R. 56(E).
 {¶ 14} In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. Jacobs v. Racevskis (1995), 105 Ohio App.3d 1, 7,663 N.E.2d 653.
 {¶ 15} In arguing that summary judgment was inappropriate, we note that Bryan Publishing relies on two separate facts which they argue amount to a breach of contract. First, Bryan Publishing argues that the Prospectus contained *Page 8 
inaccurate figures for paid circulation. Once Bryan Publishing began daily operation of the Northwest Signal, it inquired into daily paid circulation and discovered that this figure was approximately 30% less than paid circulation as represented in the Prospectus. Second, Bryan Publishing argues that the financial liability of prepaid subscriptions was omitted from the Prospectus.
 {¶ 16} Both of these arguments concern the scope of the Purchase Agreement, including what information must have been provided pursuant to that agreement. The Purchase Agreement was a contract for the sale of the Northwest Signal. Questions regarding the existence of a contract and its meaning are questions of law subject to de novo review.Saunders v. Mortensen, 101 Ohio St.3d 86, 801 N.E.2d 452, 2004-Ohio-24, at ¶ 9. "Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Skivolocki v. E. Ohio Gas Co. (1974), 38 Ohio St.2d 244,313 N.E.2d 374, paragraph one of the syllabus; Shifrin v. Forest City Ent,Inc. (1992), 64 Ohio St.3d 635, 597 N.E.2d 499, 1992-Ohio-28.
 {¶ 17} As long as a contract is clear and unambiguous, the rights and obligations of the parties are determined on the plain language of the agreement. Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108, 652 N.E.2d 684, 1995-Ohio-214. The determination whether a contract is ambiguous is a question of law. Ohio HistoricalSoc. v. Gen. Maintenance Eng. *Page 9 Co. (1989), 65 Ohio App.3d 139, 146, 583 N.E.2d 340. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. Id. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. Cincinnati Ins. Co. v. CPS Holdings, Inc. 115 Ohio St.3d 306,875 N.E.2d 31, 2007-Ohio-4917 citing Gulf Ins. Co. v. Burns Motors,Inc. (Tex. 2000), 22 S.W.3d 417, 423.
 {¶ 18} To set forth a claim for breach of contract, a complaining party must prove the following elements by a preponderance of the evidence: (1) that a contract existed; (2) that the complaining party fulfilled its contractual obligations; (3) that the opposing party failed to fulfill its obligations; and (4) that the complaining party incurred damages as a result of this failure. Farmers State Bank v.Followay, 9th Dist. No. 07CA0011, 2007-Ohio-6399, at ¶ 13, citingLawrence v. Lorain Cty. Community College (1998), 127 Ohio App.3d 546,548-49. It is an elementary rule of contracts that, upon a material breach of a contract by one party thereto, the other contracting party may, at his option, elect to rescind the contract, or continue it in force and sue for damages for the breach. Dickson v. Wilson (Nov. 27, 1934), 9th Dist. No. 2442, at * 1.
 {¶ 19} To succeed on its claim for breach of contract concerning the representation of pre-paid subscriptions in the Prospectus, Bryan Publishing must show (1) that the contract should be interpreted to incorporate the terms of the *Page 10 
Prospectus, and (2) that a material breach of these terms occurred. In the alternative, Bryan Publishing argues that if the court found that the terms of the Prospectus were not incorporated into the contract, it could still succeed by showing that the contract is ambiguous and therefore, parol evidence from the Prospectus must be read into the contract to clarify its terms.
 {¶ 20} We first turn to the language of the contract, noting that nowhere in the contract is the Prospectus referenced. The contract does contain a section entitled Representations and Warranties by Sellers which describes the warranties created by the contract, including the following:
 (5) Sellers represent and warrants to Purchaser as follows:
 Disclosure
 (x) No representation or warranty by Sellers in this Agreement or in any writing furnished or to be furnished pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements herein or therein contained not misleading.
 Nature and Survival of Representations and Warranties
 (9) All statements of fact contained in any memorandum, certificate, instrument, or other document delivered by or on behalf of Sellers for information or reliance pursuant to this Agreement shall be deemed representations and warranties by Sellers under this Agreement. All representations and warranties of the parties shall survive the Closing. *Page 11 
 {¶ 21} The contract also contains an Integrated Agreement clause which provides:
 (19) This Agreement constitutes the entire agreement between the parties hereto, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth herein or herein provided for.
 * * *
 (21) The foregoing constitutes the entire agreement and understanding of the parties on the subject hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.
 {¶ 22} In its Decision and Judgment Entry the trial court, reading the plain language of the contract, interpreted the warranty contract clauses to create a warranty only for documents furnished "pursuant to" the Purchase Agreement. Moreover, the trial court determined that "something provided "pursuant to" must post date, follow or come after; or be included or referenced within" the Purchase Agreement. We agree with the trial court in its interpretation that the Prospectus was not furnished "pursuant to" the Purchase Agreement.
 {¶ 23} We are also in agreement with the trial court that, by its very terms, the Prospectus was furnished without any warranty as to the accuracy of the information provided. The disclaimer contained in the Prospectus itself, provided as follows:
 The financial information contained in this presentation has been obtained from Napoleon, Inc. No representation or *Page 12 warranty is made as to the accuracy or completeness of such information, and nothing in the presentation is, or shall be relied on as, a promise or representation as to the future. Certain projections are included in this presentation, and although it is believed such projections are realistic, no representation can be made as to their attainability.
 {¶ 24} Accordingly, the trial court found that because the Prospectus contained its own disclaimer and was furnished well in advance of even the drafting of the Purchase Agreement,
 the terms of the Purchase Agreement and Prospectus are therefore consistent and make it clear that the statements contained the Prospectus concerning paid circulation are not representations and warranties under the Purchase Agreement upon which Plaintiff's claim for breach of contract can be based.
Decision and Judgment Entry October 17, 2007.
 {¶ 25} Nothing contained in the contract or the Prospectus incorporates any of the information in the Prospectus into the warranty contained in the Purchase Agreement. When the contract is clear and unambiguous, the court "may look no further than the four corners of the insurance policy to find the intent of the parties." McDaniel v.Rollins, 3d Dist. No. 1-04-82, 2005-Ohio-3079. An ambiguity exists "only when a provision in a policy is susceptible of more than one reasonable interpretation." Hacker v. Dickman (1996), 75 Ohio St.3d 118, 119-120,1996-Ohio-98, 661 N.E.2d 1005. Here, the language of the contract is clear and open to only one interpretation. The contract did not warranty any *Page 13 
representations made in the Prospectus. Because the language of the contract, as well as the disclaimer on the Prospectus itself, does not incorporate the terms of the Prospectus into the Purchase Agreement or warranty those terms, we cannot find a genuine issue of material fact with respect to interpretation of the contract.
 {¶ 26} Moreover, even if we were to find ambiguity in the Purchase agreement, language in an ambiguous contract will be construed strictly against the party who prepared the contract or selected the language.Cent. Realty Co. v. Clutter (1980), 62 Ohio St.2d 411, 406 N.E.2d 515;McKay Machine Co. v. Rodman (1967), 11 Ohio St.2d 77, 80,228 N.E.2d 304. Because it is clear from the record before this Court that the Purchase Agreement was prepared by counsel for Bryan Publishing we must infer that even if the contract was ambiguous, if Bryan Publishing had intended to incorporate the terms of the Prospectus into the warranty, they could have done so in drafting the Purchase agreement.
 {¶ 27} Next we turn to Bryan Publishing's argument that the Shareholders erred and violated "generally accepted accounting principles" because liability for pre-paid subscriptions was omitted from the stated liabilities which were to be disclosed to Bryan Publishing in the records provided pursuant to the Purchase Agreement.
 {¶ 28} With respect to this issue, the trial court found that
 The Purchase Agreement contains no warranty concerning prepaid subscriptions. The Court finds the affidavit of Lynn *Page 14 Newcomer, a certified public accountant, which was not refuted by Plaintiff, to be persuasive in this regard. Such reporting was consistent with Napoleon Inc.'s historic practice of bookkeeping. A liability associated with pre-paid subscriptions was not required to be reported under [generally accepted accounting principals] nor under income tax basis accounting because it did not have a material impact upon the financial condition of Napoleon, Inc. Chris Cullis admitted as much in his deposition.
 {¶ 29} As previously noted, when a party moves for summary judgment, the moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case.Dresher v. Burt (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264,1996-Ohio-107. In the present case, the Shareholders presented the affidavit of Lynn Newcomer, a certified public accountant. Newcomer testified that she had been the primary accountant for Napoleon, Inc. for the several years prior to the sale of the Northwest Signal.
 {¶ 30} Newcomer stated in her affidavit that for the years ending 2000-2002, she prepared "compiled annual financial statements on the accounting basis used for income tax purposes, which is a comprehensive basis of accounting." Moreover, Newcomer stated that she prepared a review, which is more comprehensive than a compilation, for the fiscal years ending December 31, 1997 and December 31, 1998. A copy of these reviews was attached to her affidavit and contained a disclaimer stating:
 revenue from subscriptions are recorded when received. All other revenue from advertising and other sources are recorded *Page 15 when earned. Management considers these methods to best reflect the actual earnings of the company.
Newcomer stated that this note put the reader on notice that he should make specific inquiries concerning the accounting pertaining to subscription income and liabilities.
 {¶ 31} Perhaps most importantly, Newcomer stated that the liability for prepaid subscriptions was not stated on any of the financial documents because it was not material. Newcomer stated that given the financial status of the Northwest Signal, the threshold for materiality was approximately $20,100.00. Estimates of the liability resulting from prepaid subscriptions ranged from $7,000-$8,000.
 {¶ 32} In response to the Shareholder's motion for summary judgment, Bryan Publishing provided the trial court with the affidavit of Calvin Smith, CPA. In his affidavit, Smith stated that a balance sheet was required to be given to Bryan Publishing by the shareholders based on the terms of the purchase agreement. We note that a balance sheet was given to Bryan Publishing; it simply did not comply with Smith's standards.
 {¶ 33} Smith also states that a balance sheet prepared in accordance with generally accepted accounting principles was requested by Bryan Publishing, but not provided because the Northwest Signal did not have such information. Smith's affidavit also states that the liability for pre-paid subscriptions was closer to $100,000, although he never provides for how he reached this conclusion, nor does *Page 16 
he provide a definition for what he considers to be "liability for pre-paid subscriptions."
 {¶ 34} Although these may be valid points, this Court must agree with the trial court's determination that there is no special warranty contained in the Purchase Agreement with respect to pre-paid subscriptions. Moreover, the trial court found that the information given to Bryan Publishing pursuant to the Purchase Agreement was in accordance with the Northwest Signal's general accounting practices. This was also attested to by Newcomer. Although these accounting practices may not be up to Smith's standards or the standards utilized by Bryan Publishing, these were the records available.
 {¶ 35} Furthermore, this Court agrees with the determination of the trial court that this transaction involved sophisticated business entities with a long history and experience in the newspaper business who were both represented by counsel during this transaction and; according to Smith, Bryan Publishing was represented by an accountant as well. Bryan Publishing had ample time and opportunity "to exercise and complete its "due diligence" with respect to the books, records and other matters relating to the business of the Corporation and determine that there were not previously undisclosed matters, which in the sole judgment of the purchaser would materially affect the value of the stock of the Corporation, prior to closing." Decision and Judgment Entry October 17, 2007. *Page 17 
Moreover, Bryan publishing was required to complete due diligence by section 8(a) of the Purchase Agreement which provides in pertinent part:
 Unless waived, in whole or in part, in writing by Purchaser, the obligations of Purchaser hereunder are subject to the fulfillment, prior to or at the Closing, of each of the following conditions: Purchaser having completed its due diligence with respect to the books, records and other matters relating to the business of the Corporation and having determined that there are no previously undisclosed matters which, in the sole judgment of the purchaser, materially affect the value of the stock of the Corporation. . .
 {¶ 36} Although Smith stated that Bryan Publishing placed significant importance upon the daily paid circulation figures and paid subscription figures, if the omission of these figures was a glaring error in the Northwest Signal's accounting, Bryan Publishing, with the aid of Smith, should have made further inquiry into this error during the period of due diligence. Nothing in the record before this Court indicates that any of the financial records of the Northwest Signal were unavailable to Bryan Publishing, that the Northwest Signal attempted to hide any records, or that Bryan Publishing had to do anything more than ask for additional information.
 {¶ 37} Although the reports may not have been prepared in perfect accordance with generally accepted accounting principles, this was noted in the reports given to Bryan Publishing. Additionally, Bryan Publishing had the aid of *Page 18 
an accountant, Calvin Smith, in completing the transaction. Based on what he recognized as anomalies in the accounting, Bryan Publishing was compelled to investigate these abnormalities during the due diligence period. Instead, Bryan Publishing ignored any potential problems, proceeded to purchase the Northwest Signal, and then sought remedy in the courts. Therefore, we cannot find that a genuine issue of material fact existed as to the omission of pre-paid subscriptions from the liabilities of the Northwest Signal.
 {¶ 38} Moreover, the same rationale can be used with respect to the figure contained in the Prospectus for paid circulation. In the Prospectus, Bryan Publishing was confronted with conflicting information. On pages 1 and 4, the Prospectus states that the Northwest Signal is a "5,600-circulation daily." On page 5, the Prospectus refers to a total "paid circulation" of 5,601. On another page, it appears that circulation is stated to be approximately 5,300. These are significant discrepancies, both numerically and in terminology. Bryan Publishing had ample opportunity during the due diligence period to discover these discrepancies. Moreover, almost immediately after closing the sale, Bryan Publishing requested that the circulation manager prepare a paid subscribers list. Nothing prohibited Bryan Publishing from investigating this matter prior to closing. *Page 19 
 {¶ 39} In sum, this Court agrees with the trial court that Bryan Publishing "was obliged to inquire further prior to closing and it did not do so." Based on the foregoing, Bryan Publishing's assignments of error are overruled.
 {¶ 40} Accordingly, the October 17, 2007 Decision and Judgment Entry of the Court of Common Pleas, Henry County, Ohio granting summary judgment in favor of the Shareholders is affirmed.
Judgment Affirmed.
 PRESTON and ROGERS, J.J., concur.
[1] It appears, from the record before this Court, that the sole purpose of the corporation Napoleon, Inc. was the operation of the Northwest Signal. Because Napoleon Inc.'s sole purpose was to operate the Northwest Signal, and because the Northwest Signal is the subject of the appeal, we will refer to the sale of the Northwest Signal, not the sale of Napoleon, Inc. *Page 1